**GLANCY BINKOW & GOLDBERG LLP**
LIONEL Z. GLANCY (#134180)
MICHAEL GOLDBERG (#188669)
ROBERT V. PRONGAY (#270796)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:      (310) 201-9150
Facsimile:      (310) 201-9160
E-mail:          info@glancylaw.com

*Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SANJIV MEHROTRA, Individually and on Behalf of All Others Similarly Situated,<br><br>                          Plaintiff,<br><br>              v.<br><br>ROCKET FUEL INC., GEORGE H. JOHN, J. PETER BARDWICK, SUSAN L. BOSTROM, RONALD E. F. CODD, WILLIAM ERICSON, RICHARD FRANKEL, JOHN GARDNER, CLARK KOKICH, MONTE ZWEBEN, CREDIT SUISSE SECURITIES (USA) LLC, CITIGROUP GLOBAL MARKETS INC., NEEDHAM & COMPANY, LLC, OPPENHEIMER & CO. INC., PIPER JAFFRAY & CO., BMO CAPITAL MARKETS CORP., and LUMA SECURITIES LLC,<br><br>                      Defendants. | Case No.:<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

CLASS ACTION COMPLAINT

Plaintiff Sanjiv Mehrotra("Plaintiff"), by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by ROCKET FUEL INC. ("Rocket Fuel" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by Rocket Fuel; and (c) review of other publicly available information concerning Rocket Fuel.

**NATURE OF THE ACTION AND OVERVIEW**

1.      This is a class action on behalf of persons or entities who purchased or otherwise acquired Rocket Fuel securities: (1) pursuant and/or traceable to the Company's Registration Statement and Prospectus (collectively, the "Registration Statement") issued in connection with the Company's initial public offering on or about September 19, 2013 (the "IPO" or the "Offering"); and/or (2) on the open market between September 20, 2013 and August 5, 2014, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies under the Securities Act of 1933 (the "Securities Act") and under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Rocket Fuel delivers a programmatic media-buying platform at Big Data scale that uses artificial intelligence ("AI") to purportedly improve marketing return on investment ("ROI") in digital media across web, mobile, video, and social channels.  The Company provides digital advertising and marketing programs globally for customers in North America, Europe, and Japan.

3.      According to the Company, there are tens of billions of daily trades across all digital advertising exchanges, and the Company's AI system autonomously purchases ad spots, or impressions, one at a time, on these exchanges to create portfolios of impressions designed to optimize the goals of its advertisers, such as increased sales, heightened brand awareness and decreased cost per customer acquisition.  According to the Company, its system is designed to optimize both direct-response campaigns focused on generating specific consumer purchases or responses, as well as brand campaigns geared towards lifting brand metrics, generally defined as cost-per-click and brand survey goals.  The Company markets a "Real-Time Brand Safety Shield" which claims to proactively protect their client's brand from unwanted sites and content.

4.      On or about September 25, 2013, Rocket Fuel completed its IPO, in which 4,000,000 shares of common stock were sold by the Company and 600,000 shares of common stock were sold by selling stockholders at a price  of $29.00 per share.  The Company did not receive any proceeds from the sales of shares by the selling stockholders.  According to the Company, the Offering raised approximately $107.9 million in net proceeds for the Company, after deducting underwriting discounts and commissions of approximately $8.1 million.

5.      On August 5, 2014,  after the market closed, Rocket Fuel revealed that the Company was lowering its full year 2014 guidance purportedly due to recent customer concerns about inventory quality.  During an investor conference call on August 5, 2014, Defendant John claimed that "[a]cross all channels, we've seen increased advertiser and agency interest in the quality of ad space and audiences they buy with increased concerns around bot traffic and viewability."

6.      On this news, shares of Rocket Fuel declined $7.70 per share, over 31%, to close on August 6, 2014, at $17.05 per share, on unusually heavy volume.

CLASS ACTION COMPLAINT
2

7.      Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose: (1) that a significant percentage of ads brokered by Rocket Fuel were viewed by automated computer programs rather than humans; (2) that the Company was unable to detect and eliminate a significant amount of ad fraud despite representations to the contrary; (3) that, as a result, the Company customers were concerned about ad fraud and inventory quality; and (4) that, as a result of the foregoing, Defendants' statements, including statements about Rocket Fuel's ability to protect its customers from ad fraud and the Company's 2014 revenue growth, were materially false and misleading at all relevant times.

8.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Rocket Fuel's principal executive offices

CLASS ACTION COMPLAINT
3

are located within this Judicial District, and a significant portion of Defendants' actions, and the subsequent damages, took place in this Judicial District.

12.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

13.     Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Rocket Fuel common stock during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.     Defendant Rocket Fuel is a Delaware corporation with its principal executive offices located at 1900 Seaport Boulevard, Pacific Shores Center, Redwood City, California 94063.

15.     Defendant George H. John ("John") was, at all relevant times, Chief Executive Officer ("CEO") and a director of Rocket Fuel and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

16.     Defendant J. Peter Bardwick ("Bardwick") was, at all relevant times, Chief Financial Officer ("CFO") of Rocket Fuel and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

17.     Defendant Susan L. Bostrom ("Bostrom") was, at all relevant times, a director of Rocket Fuel and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

18.     Defendant Ronald E. F. Codd ("Codd") was, at all relevant times, a director of Rocket Fuel and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

19.     Defendant William Ericson ("Ericson") was, at all relevant times, a director of Rocket Fuel and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

20.     Defendant Richard Frankel ("Frankel") was, at all relevant times, a director of Rocket Fuel and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

21.     Defendant John Gardner ("Gardner") was, at all relevant times, a director of Rocket Fuel and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

22.     Defendant Clark Kokich ("Kokich") was, at all relevant times, a director of Rocket Fuel and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

23.     Defendant Monte Zweben ("Zweben") was, at all relevant times, a director of Rocket Fuel and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

24.     Defendants John, Bardwick, Bostrom, Codd, Frankel, Ericson, Gardner, Kokich, and Zweben are collectively referred to hereinafter as the "Individual Defendants."   The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Rocket Fuel's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors,

*i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

25.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") served as an underwriter and joint book-running manager of the Company's IPO.  In the Offering, Credit Suisse agreed to purchase 1,280,000 shares of Rocket Fuel, exclusive of the over-allotment option.

26.     Defendant Citigroup Global Markets Inc. ("Citigroup") served as an underwriter and joint book-running manager of the Company's IPO.  In the Offering, Citigroup agreed to purchase 1,280,000 shares of Rocket Fuel, exclusive of the over-allotment option.

27.     Defendant Needham & Company, LLC ("Needham") served as an underwriter to Rocket Fuel in connection with the Offering.  In the Offering, Needham agreed to purchase 360,000 shares of Rocket Fuel, exclusive of the over-allotment option.

28.     Defendant Oppenheimer & Co. Inc. ("Oppenheimer") served as an underwriter to Rocket Fuel in connection with the Offering.  In the Offering, Oppenheimer agreed to purchase 360,000 shares of Rocket Fuel, exclusive of the over-allotment option.

29.     Defendant Piper Jaffray & Co. ("Piper Jaffray") served as an underwriter to Rocket Fuel in connection with the Offering.  In the Offering, Piper Jaffray agreed to purchase 360,000 shares of Rocket Fuel, exclusive of the over-allotment option.

30.     Defendant BMO Capital Markets Corp. ("BMO") served as an underwriter to Rocket Fuel in connection with the Offering.  In the Offering, BMO agreed to purchase 240,000 shares of Rocket Fuel, exclusive of the over-allotment option.

31.     Defendant LUMA Securities LLC ("LUMA") served as an underwriter to Rocket Fuel in connection with the Offering.  In the Offering, LUMA agreed to purchase 120,000 shares of Rocket Fuel, exclusive of the over-allotment option.

32.     Defendants Credit Suisse, Citigroup, Needham, Oppenheimer, Piper Jaffray, BMO, and LUMA, are collectively referred to hereinafter as the "Underwriter Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

33.     Rocket Fuel delivers a programmatic media-buying platform at Big Data scale that uses artificial intelligence ("AI") to improve marketing return on investment ("ROI") in digital media across web, mobile, video, and social channels.  The Company provides digital advertising and marketing programs globally for customers in North America, Europe, and Japan.

34.     Advertising is one of the primary means for revenue generation for millions of websites and mobile applications.  Most online advertising revenues are based on pay-per-click, but impression-based display and video advertising is also common.

35.     Robotic traffic ("bot traffic") is web traffic generated by automated botnet programs rather than humans, intended to mimic human behavior.  Some bot traffic is considered

good, such as those used by search engines and Web performance tools.  Malicious bot traffic includes scraper, hacking tools, spammer, and impersonators.  A significant portion of bot traffic creates fake traffic aimed at generating fraudulent ad revenue through false clicks and false impressions.  Click fraud occurs when a person or generally an automated program imitates a legitimate web user by clicking on an ad to generate revenue from pay-per-click online advertising. False impressions occur when programs imitate legitimate website viewers by repeatedly loading an ad or page to increase the page views, measured in cost per mille ("CPM"), or cost per thousand advertising impressions.  Bot traffic is difficult to detect and harms advertisers, who typically pay for ads whenever they are loaded onto a website or clicked on regardless of whether the web user is a human or robot.

36.     On August 9, 2011, the Company published a blog post on its website entitled, "Announcing Rocket Fuel's Real-Time Brand Safety Shield."  Therein, the Company, in relevant part, stated:

> Brand Safety is a top priority for our brand advertisers and their agencies, and at Rocket Fuel we treat it as a matter of the utmost importance.  So we're proud to announce the details on how our Real-Time Brand Safety Shield provides the highest levels of brand assurance to our clients.
>
> At Rocket Fuel we take a proactive approach, with three layers of defense that block bad sites and pages before we ever serve a single ad on them. By building additional levels of safety and security right into our platform and processes, we ensure our technology delivers both ROI and peace of mind for brands.  We'll have even more news in the coming weeks about the upcoming ad verification guidelines that we are helping to drive as part of a working group established to create brand safety verification guidelines. The working group is a joint effort between the IAB and the MRC (Media Rating Council).



**What are the three layers of protection in the Real-time Brand Safety Shield?**
- The first layer is real-time protection provided by DoubleVerify, Peer39, AdExpose or other third party as desired by a client, wherein each impression is reviewed individually and in milliseconds.
- The second layer is a partnership with AdSafe, with whom we continuously refine our library of sites and patterns.
- The third layer consists of a proprietary library of non-brandsafe sites and words. For example, our black list and white list technology allow for an unlimited number of sites and keywords. We don't just block bad sites, we also block bad pages within good sites, such as incendiary political content or hate speech. Our in-house list has tens of thousands of them and all are manually reviewed.

**How does the Rocket Fuel Real-time Brand Safety Shield work?**
Rocket Fuel recognizes that the variety of available brand protection solutions possess different strengths, methods of categorizing content and securing brand safety. None of them are perfect. Protecting our clients' brand is of the utmost importance to us, so we take a radical, multi-layered approach to ensure that our clients are protected. Our solution includes:

- **Site Exclusions** – When sites are identified as unsafe, Rocket Fuel bans them from the network at the domain level. This prevents our system from ever bidding on impressions on behalf of our advertisers that contain a known, unsafe domain.

- **Real-time Filtering** – We have multiple controls in place to block undesirable content in real time, using a combination of third party and proprietary technology. Our foundational solutions and technology continually identify sites and pages that are unsafe. Our real-time keyword filtering blocks any site or page with potentially offending content before we bid on it.
- **Manual Validation** – At Rocket Fuel we believe it is critical to combine both human and machine reviews. Our team double-checks third party verification results creating the most comprehensive keyword exclusion, content category filters and network-level site filters.
- **AdSafe** – This brand safety and verification service provides domain-level analysis, page-level analysis, semantic analysis and image analysis. Sites are given separate scores for a range of categories. AdSafe results are fed back into our system, and are included in our real-time brand safety shield.
- **DoubleVerify, Peer39, AdExpose and other Third Party Providers** – We work with these vendors to create customized Rocket Fuel-specific category filtering, tags and a verification profile. Sensitive categories of content where advertisers do not want their ads to serve are filtered out. The system also verifies and excludes pages with a high percentage of ad clutter. We recognize that clients may have specific preferences or preexisting relationships with specific brand safety third parties and are always happy to work with any providers our clients desire.
- **Proprietary Ad Server** – We have a complete ad serving platform behind the exchanges, enabling us to add layers of defense beyond what the exchanges can offer and to quickly implement new technology.
- **Brand Assurance Expertise** – We have a dedicated brand assurance officer whose sole focus is on monitoring all of the above processes and systems, making decisions on policy, offering guidance to clients and continuously analyzing & improving the Rocket Fuel brand assurance shield.

37.    Through August 5, 2014, the Company's website continued to advertise Rocket Fuel's "Real-Time Brand Safety Shield" in a similar fashion.

38.    On March 29, 2012, Incapsula Inc. ("Incapsula") published an article on its blog entitled, "What Google doesn't show you: 31% of website traffic can harm your business." According to the article, 51% of a website's traffic consisted of non-human traffic. According to the article, after excluding "good" bot traffic, 31% of web traffic consisted of malicious bots.

39.    On September 19, 2013, the SEC declared effective the Form S-1 that Rocket Fuel filed on August 16, 2013 and repeatedly amended, until on or about September 19, 2013,

1    when the Company filed with the SEC the final Form S-1/A (collectively, the "Registration

2    Statement") for the IPO.

3         40.    On or about September 25, 2013, Rocket Fuel completed its IPO, in which

4    4,000,000 shares of common stock were sold by the Company and 600,000 shares of common

5    stock were sold by selling stockholders at a price of $29.00 per share.  The Company did not

6    receive any proceeds from the sales of shares by the selling stockholders.  According to the

7    Company, the Offering raised approximately $107.9 million in net proceeds for the Company,

8    after deducting underwriting discounts and commissions of approximately $8.1 million.

9

10        41.    On December 9, 2013, Incapsula published an article on its blog entitled, "Report:

11   Bot traffic is up to 61.5% of all website traffic" as a follow-up to its March 29, 2012 article

12   referenced in ¶38.  According to the article, bot traffic grew in 2013 to 61.5%, a 21% increase

13   since 2012.

14

15        42.    Following the Incapsula report, numerous media outlets published articles

16   discussing the rise in bot traffic.

17        43.    On January 6, 2014, the *New York Observer* published an article on its Betabeat

18   blog entitled, "Fake Traffic Means Real Paydays."  According to the article, a recent comScore

19   study found that 54% of display ads shown in thousands of campaigns between May 2012 and

20   February 2013 never appeared in front of a human being.

21

22        44.    On March 23, 2014, the *Wall Street Journal* published an article on its Betabeat

23   blog entitled, "A 'Crisis' in Online Ads: One-Third of Traffic Is Bogus."  According to the

24   article, certain digital advertisers have held back on advertising or demanded more aggressive

25   monitoring or free ad space due to such concerns.  The article stated that according to Vivek

26

27

28

1    Shah, the chairman of the Interactive Advertising Bureau, internet advertising was facing a

2    "crisis."

3                          **Materially False and Misleading**
                          **Statements Issued During the Class Period**
4

5        45.    The Class Period begins on September 20, 2013.  On or about this day, the

6    Company filed with the SEC its IPO Prospectus (the "Prospectus"), which forms part of the

7    Registration Statement.  Under applicable SEC rules and regulations, the Registration Statement

8    was required to disclose known trends, events or uncertainties that were having, and were

9    reasonably likely to have, an impact on the Company's continuing operations.

10

11       46.    With respect to the Company's view of fraud detection, the Registration

12   Statement stated, in relevant part:

13       In the past, the market for buying and selling digital advertising was relatively
         simple, with advertisers and publishers transacting directly with one another. As
14       Internet usage increased, the number of publishers with significant advertising
         inventory increased. However, the vast majority of publishers lacked the scale and
15       capabilities to effectively monetize their inventory. As a result, advertising
         networks were built to purchase unsold advertising inventory from multiple
16       publishers and then package and sell the inventory to advertisers. In recent years,
         this trend has resulted in the emergence and rapid growth of real-time advertising
17       exchanges, which have reduced the transactional friction that historically was
         associated with the buying and selling of digital advertising inventory. ***Like stock***
18       ***exchanges for buyers and sellers of investment securities, real-time advertising***
         ***exchanges  enable  increased  liquidity,  transparency  and  efficiency  in***
19       ***transactions between advertisers and publishers.***
20
         Real-time bidding, or RTB, is the real-time purchase and sale of advertising
21       inventory on an impression-by-impression basis on real-time advertising
         exchanges. According to IDC, RTB is expanding faster than any other segment of
22       the digital advertising industry, with total RTB sales increasing from
         approximately $3 billion in 2012 to approximately $14 billion in 2016,
23       representing a 47% CAGR. We believe the following key factors are driving the
         growth of RTB:
24

25       •   *Programmatic buying.* Programmatic buying enables the automated
             buying of advertising inventory, typically using predefined and data-
26           driven algorithms. The widespread industry adoption of programmatic

27

28

                          CLASS ACTION COMPLAINT
                                      12

buying, which was initially available only for display advertising inventory, has expanded to mobile, social and video inventory, and has accelerated the growth of RTB.

- *Abundance of inventory.* Digital advertising inventory has substantially grown in recent years, as consumers continue to migrate online using a multitude of devices to consume an increasing amount of digital content across display, mobile, social and video channels, and as the number of websites and mobile applications continues to increase exponentially.

- *Publisher adoption.* For publishers, digital advertising opportunities can be short lived, as users move frequently among different websites and applications. To efficiently monetize these perishable digital advertising opportunities, publishers are seeking solutions that expose their inventory to large pools of potential advertisers who purchase inventory through real-time advertising exchanges. Publishers are making an increasing amount of their digital advertising inventory available through real-time advertising exchanges because doing so enables them to derive higher prices for their inventory due to competitive bidding dynamics. As a result of this trend, digital advertising inventory is becoming increasingly abundant, liquid and purchasable programmatically.

- *Precision for advertisers.* Real-time advertising exchanges provide advertisers with access to large pools of inventory on an impression-by-impression basis through competitive market-driven pricing, providing the opportunity to efficiently and effectively achieve their campaign goals.

- *Virtuous cycle.* The shift of advertising budgets toward real-time advertising exchanges is creating a virtuous growth cycle. ***As demand for digital advertising inventory grows, publishers increase the supply of digital advertising inventory, thereby enabling better advertising results. As results improve, demand for additional inventory increases, which then leads to increased incentives for publishers to make additional inventory available through real-time advertising exchanges.***

(Emphasis added).

47.   With respect to the importance of fraud detection, the Registration Statement stated, in relevant part:

> ***If we fail to detect fraud or serve our advertisers' advertisements on undesirable websites, our reputation will suffer, which would harm our brand and reputation and negatively impact our business, financial condition and results of operations.***

CLASS ACTION COMPLAINT
13

Our business depends in part on providing our advertisers with a service that they trust, and we have contractual commitments to take reasonable measures to prevent advertisers' advertisements from appearing on undesirable websites or on certain websites that they identify. We use proprietary technology to detect click fraud and block inventory that we know or suspect to be fraudulent, including "tool bar" inventory, which is inventory that appears within an application, often called a "tool bar," and that overlays a website and displaces any advertising that would otherwise be displayed on such website. We also use third-party services in an effort to prevent our advertisers' advertisements from appearing on undesirable websites. Preventing and combating fraud requires constant vigilance, and we may not always be successful in our efforts to do so. We may serve advertising on inventory that is objectionable to our advertisers, and we may lose the trust of our advertisers, which would harm our brand and reputation and negatively impact our business, financial condition and results of operations. We may also purchase inventory inadvertently that proves to be unacceptable for advertising campaigns, in which case we are responsible for the cost and cannot bill that cost to any campaign. If we buy substantial volumes of unusable inventory, this could negatively impact our results of operations.

48.   The Registration Statement was false and misleading because Defendants failed to disclose that the Company was not adequately detecting and preventing digital ad fraud and that a significant portion of the advertisements that the Company brokered were being viewed by computer programs rather than humans.

49.   On November 6, 2013, Rocket Fuel published a blog post on its website entitled, "Rocket Fuel Brand Safety Series: Suspicious Activity" and a video entitled, "Fighting Fraud and Keeping Brands Safe: Suspicious Activity."  Therein, the Company, in relevant part, stated:

Rocket Fuel is committed to confronting suspicious activity to make the entire online advertising ecosystem a safe, productive place for business.

By joining forces with our security partners, Rocket Fuel undermines fraudulent practices and makes sure con artists always leave empty handed. Using the same powerful technology that optimizes our clients' campaigns, ***Rocket Fuel is able to identify and eliminate all threats before serving a single ad.***

(Emphasis added).

50.   On November 7, 2013, Rocket Fuel issued a press release entitled, "Rocket Fuel Reports Record Revenue In Third Quarter 2013."  Therein, the Company, in relevant part, stated:

CLASS ACTION COMPLAINT
14

Rocket Fuel Inc. (NASDAQ: FUEL), a leading provider of artificial intelligence (AI) advertising solutions for digital marketers, today reported financial results for the third quarter ended September 30, 2013.

"Rocket Fuel continued its strong growth during the third quarter, as revenue grew 132% to $62.5 million. We continued this fast-paced growth - while managing EBITDA close to break even, producing an adjusted EBITDA loss of $(0.7) million," said George John, Chairman and CEO of Rocket Fuel. "Compared to last year's third quarter we more than doubled our customer base and more than tripled the percent of revenue coming from new advertising channels that include mobile, social and video, to 26% of our total revenue. We maintained our focus on increasing market share, investing heavily in growth, continuing to expand our big data technology platform and artificial intelligence technology, and adding high-quality employees."

**Financial and Business Highlights for the Third Quarter of 2013**

**Revenue** of $62.5 million increased 132% compared to $26.9 million for the third quarter of 2012.

**Revenue less media costs** of $36.0 million increased 149%, compared to $14.4 million for the third quarter of 2012, growing to 58% of revenue for the current quarter.(1)

**Gross Profit** of $30.6 million increased 156% compared to $11.9 million over the prior year period representing a Gross Margin improvement to 49% from 44%.

**Net Loss** was $(6.9) million, or $(0.61) per diluted share, as compared to a net loss of $(2.0) million, or $(0.25) per diluted share in the third quarter of 2012. Adjusted net loss for the quarter was $(1.8) million, or $(0.16) per diluted common share.

**Adjusted EBITDA** loss was $(0.7) million compared to a loss of $(0.5) million in the third quarter of 2012.(1)

**Other channels revenue** which includes revenue from delivery of digital advertising to mobile, social, and video channels of $16.2 million increased by 735% compared to $1.9 million for the third quarter of 2012 and more than tripled from 7% to 26% as a percentage of revenue from the prior year period.

**Active customer** count expanded to 938, up from 406 in the third quarter of 2012.

**Employee headcount** increased by 263 in the first three quarters of 2013 to a total 552 as of September 30, 2013.

CLASS ACTION COMPLAINT
15

**International offices** now include a presence in Stockholm, Sweden and Milan, Italy.

**Cash and Cash equivalents** as of September 30, 2013 were $125.3 million. Rocket Fuel received net proceeds from its IPO of $107.9 million during the third quarter.

**Shares outstanding** as of September 30, 2013 were 32.8 million.

**Business Outlook**

"Our strong financial performance in the first three quarters of the year signals an ongoing potential to drive rapid growth and scale while managing costs," said Peter Bardwick, CFO of Rocket Fuel.  "We will continue to invest in talent and our technology which we believe will position us to increase our share of the markets in which we compete and to achieve continued growth in the future."

Rocket Fuel's fourth quarter and full year outlook is as follows:

**Fourth Quarter 2013**

- Revenue in the range of $74 million to $77 million

- Adjusted EBITDA  in the range of $1.0 million to $2.0 million

**Fiscal Year 2013**

- Revenue in the range of $229 million to $232 million

- Adjusted EBITDA loss in the range of $(3.9) million to $(2.9) million

51.    On November 13, 2013, Rocket Fuel filed its Quarterly Report with the SEC on Form 10-Q for the 2013 fiscal third quarter.  The Company's Form 10-Q was signed by Defendant Bardwick, and reaffirmed the Company's financial results previously announced on November 7, 2013.

52.    On January 31, 2014, Rocket Fuel filed with the SEC its Prospectus for a Secondary Public Offering (the "Secondary Prospectus"), which forms part of the Registration Statement (the "Secondary Registration Statement") that was declared effective by the SEC on January 30, 2014.  According to the Company, Rocket Fuel sold

CLASS ACTION COMPLAINT
16

53.     On February 5, 2014, Rocket Fuel completed its follow-on offering (the "Secondary Offering"), in which 2,000,000 shares of common stock were sold by the Company and 3,000,000 shares of common stock were sold by selling stockholders at a price of $61.00 per share.   The Company did not receive any proceeds from the sales of shares by the selling stockholders.   According to the Company, the Offering raised approximately $116.5 million in net proceeds for the Company, after deducting underwriting discounts and commissions of approximately $5.5 million.   Defendants John and Frankel sold over 562,000 shares total, each earning over $14 million from the Secondary Offering.

54.     With respect to the importance of fraud detection, the Secondary Registration Statement stated, in relevant part:

> ***If we fail to detect fraud or serve our advertisers' advertisements on undesirable websites, our reputation will suffer, which would harm our brand and reputation and negatively impact our business, financial condition and results of operations.***
>
> Our business depends in part on providing our advertisers with a service that they trust, and we have contractual commitments to take reasonable measures to prevent advertisers' advertisements from appearing on undesirable websites or on certain websites that they identify. We use proprietary technology to detect click fraud and block inventory that we know or suspect to be fraudulent, including "tool bar" inventory, which is inventory that appears within an application, often called a "tool bar," and that overlays a website and displaces any advertising that would otherwise be displayed on such website. We also use third-party services in an effort to prevent our advertisers' advertisements from appearing on undesirable websites. Preventing and combating fraud requires constant vigilance, and we may not always be successful in our efforts to do so. We may serve advertising on inventory that is objectionable to our advertisers, and we may lose the trust of our advertisers, which would harm our brand and reputation and negatively impact our business, financial condition and results of operations. We may also purchase inventory inadvertently that proves to be unacceptable for advertising campaigns, in which case we are responsible for the cost and cannot bill that cost to any campaign. If we buy substantial volumes of unusable inventory, this could negatively impact our results of operations.

*If our access to quality advertising inventory is diminished or if we fail to acquire new advertising inventory, our revenue could decline and our growth could be impeded.*

We must maintain a consistent supply of attractive advertising inventory, meaning the digital space on which we place advertising impressions, including websites, proprietary social networks, such as Facebook, and mobile applications. Our success depends on our ability to secure quality inventory on reasonable terms across a broad range of advertising networks and exchanges, including real time advertising exchanges, such as Google's DoubleClick Ad Exchange or AppNexus; suppliers of video and mobile inventory; and social media platforms, such as the Facebook Exchange, known as FBX.

The amount, quality and cost of inventory available to us can change at any time. Our suppliers are generally not bound by long-term contracts. As a result, we cannot provide any assurance that we will have access to a consistent supply of quality inventory. Moreover, the number of competing intermediaries that purchase advertising inventory from real-time advertising exchanges continues to increase, which could put upward pressure on inventory costs. If we are unable to compete favorably for advertising inventory available on real-time advertising exchanges, or if real-time advertising exchanges decide not to make their advertising inventory available to us, we may not be able to place advertisements at competitive rates or find alternative sources of inventory with comparable traffic patterns and consumer demographics in a timely manner. Furthermore, the inventory that we access through real-time advertising exchanges may be of low quality or misrepresented to us, despite attempts by us and our suppliers to prevent fraud and conduct quality assurance checks.

Suppliers control the bidding process for the inventory they supply, and their processes may not always work in our favor. For example, suppliers may place restrictions on the use of their inventory, including restrictions that prohibit the placement of advertisements on behalf of certain advertisers. Through the bidding process, we may not win the right to deliver advertising to the inventory that we select and may not be able to replace inventory that is no longer made available to us.

If we are unable to maintain a consistent supply of quality inventory for any reason, our business, advertiser retention and loyalty, financial condition and results of operations would be harmed.

55.   On February 20, 2014, Rocket Fuel issued a press release entitled, "Rocket Fuel Reports Record Revenue in the Fourth Quarter and Full Year 2013." Therein, the Company, in relevant part, stated:

*Fourth Quarter Revenue, Gross Profit, and Active Customers All More Than Doubled Year Over Year*

Rocket Fuel Inc. (Nasdaq:FUEL), a leading provider of artificial intelligence and big data solutions for digital advertising, today reported financial results for the fourth quarter and year ended December 31, 2013.

"Rocket Fuel continued to deliver excellent results for advertisers in the fourth quarter, with all financial metrics coming in slightly ahead of the estimated ranges we provided in January. Our full year 2013 revenue of $240.6 million represented 126% growth over 2012, and we achieved our first full year of positive Adjusted EBITDA results as our technology investments powered gross margin expansion while we demonstrated operating leverage in sales and marketing," said George John, Chairman and CEO of Rocket Fuel. "We ended 2013 with more than double the active customer base from 2012 and advertisers are increasingly using Rocket Fuel for multi-channel campaigns, demonstrated by the 721% growth of mobile, social, and video channel revenue versus Q4 2012, which comprised 32% of our total revenue in Q4 2013. As marketers' demand for serious results grows, so does Rocket Fuel's opportunity, and the disruptive power of our artificial intelligence-driven solutions enable us to take share within the rapidly growing global digital advertising market."

**<u>Financial and Business Highlights for the Fourth Quarter of 2013</u>**

**Revenue** of $85.6 million increased 113% compared to $40.1 million for the fourth quarter of 2012.

**Revenue less media costs** of $49.6 million increased 148%, compared to $20.0 million for the fourth quarter of 2012, growing to 58% of revenue for the current quarter.

**Gross Profit** of $41.6 million increased 144% compared to $17.1 million over the prior year period representing a Gross Margin improvement to 49% from 43%, a 601 basis point expansion.

**Net Loss** was $(2.2) million, or $(0.07) per diluted share, as compared to a net loss of $(5.9) million, or $(0.72) per diluted share in the fourth quarter of 2012. Adjusted net income[1] for the quarter was $2.4 million, or $0.06 per diluted common share, as compared to adjusted net loss of $(1.9) million, or $(0.23) per diluted share in the fourth quarter of 2012.

**Adjusted EBITDA** income was $5.3 million compared to a loss of $(1.3) million in the fourth quarter of 2012.

**Other channels revenue** which includes revenue from delivery of digital advertising to mobile, social, and video channels of $27.4 million increased by

721% compared to $3.3 million for the fourth quarter of 2012 and quadrupled from 8% to 32% as a percentage of revenue from the prior year period. Mobile was the largest component of other channels revenue, at 19% of revenue in the fourth quarter of 2013.

**Active customer** count expanded to 1,224, up from 536 in the fourth quarter of 2012**.**

**<u>Financial and Business Highlights for the Fiscal Year ended December 31, 2013</u>**

**Revenue** of $240.6 million increased 126% compared to $106.6 million for the year ended December 31, 2012.

**Revenue less media costs** of $137.0 million increased 145%, compared to $55.9 million for the year ended December 31, 2012, growing to 57% of revenue for the current year.

**Gross Profit** of $115.1 million increased 147% compared to $46.6 million over the prior year period representing a Gross Margin improvement to 48% from 44%, a 413 basis point expansion.

**Net Loss** was $(20.9) million, or $(1.38) per diluted share, as compared to a net loss of $(10.3) million, or $(1.29) per diluted share for the year ended December 31, 2012. Adjusted net loss[1] for the year was $(5.4) million, or $(0.35) per diluted common share, as compared to adjusted net loss of $(4.7) million or $(0.59) per diluted share for the year ended December 31, 2012.

**Adjusted EBITDA** income was $0.3 million compared to a loss of $(3.0) million in the year ended December 31, 2012.

**Other channels revenue** which includes revenue from delivery of digital advertising to mobile, social, and video channels of $57.8 million increased by 577% compared to $8.5 million for the year ended December 31, 2012 and tripled from 8% to 24% as a percentage of revenue from the prior year period.

**Employee headcount** increased by 330 in the year 2013 to a total 619 as of December 31, 2013.

**Cash and cash equivalents** as of December 31, 2013 were $113.9 million. Rocket Fuel received net proceeds from its IPO of $103.3 million during 2013. Subsequently in February 2014, Rocket Fuel received net proceeds from its follow-on offering of $116.5 million.

**Total debt** was $26.8 million as of December 31, 2013.

**Business Outlook**

"Our robust revenue growth and continued focus on operational efficiency puts us on a strong trajectory for 2014," said J. Peter Bardwick, CFO of Rocket Fuel. "We have significantly strengthened our balance sheet which increases our ability to gain advantages within a fragmented, rapidly growing market. We believe that continued investment in talent, technology and infrastructure will enable us to continue to increase market share while expanding our total available market opportunities through new channels, products and geographies."

Rocket Fuel reiterated its first quarter and full year outlook as follows:

**First Quarter 2014**

- Revenue in the range of $73.0 million to $76.0 million
- Adjusted EBITDA in the range of $(9.0) million to $(7.5) million

**Fiscal Year 2014**

- Revenue in the range of $420.0 million to $435.0 million
- Adjusted EBITDA in the range of $3.0 million to $6.0 million

56.     On February 28, 2014, Rocket Fuel filed its Annual Report with the SEC on Form 10-K for the 2013 fiscal year.  The Company's Form 10-K was signed by Defendants John and Bardwick, and reaffirmed the Company's financial results previously announced on February 20, 2014.

57.     On April 25, 2014, *AdExchanger* published an article entitled, "Rocket Fuel Stock Hits All-Time Low In Wake Of Insider Trades."  Therein, the article, in relevant part, stated:

Rocket Fuel's stock closed at $31.04 Friday, near its lowest point since the ad tech company went public six months ago. ***The sell-off comes after a group of more than seven investors and senior executives cashed out to the tune of more than $150 million, as reported by InsiderTradingWire. Those transactions, which earned more than $14 million each for the company's top two executives, CEO George John and President Richard Frankel, took place between February 3 and February 7.***

Rocket Fuel's market cap is now just north of $1 billion, about half of the $2 billion where it made its NASDAQ debut last September.

Here are the largest of the insider stock sales from early February, according to InsiderTradingWire:

George John, CEO, sold $17,935,375
Abhinav Gupta, VP Engineering, sold $10,293,038
Richard Frankel, President, sold $14,627,030
J. Bardwick Peter, CFO, sold $1,000,738
John Gardner, investor at Nokia Growth Partners, sold $23,750,156
William Ericson, investor at MDV Ninth Partners, sold $101,063,336

Update: The sales appear to be part of a follow-on public offering that the company pre-announced in late January. In a registration document filed with the SEC, Rocket Fuel proposed to offer 2 million shares and certain selling stockholders signaled plans to sell 3 million. At the time, John called it "a necessary step in stabilizing the stock and making shares accessible to more investors."

But since those sales the stock has fallen steadily, with only a brief reprieve toward the end of February.

Wall Street can get jittery when insiders sell large stock volumes, although in Rocket Fuel's particular case it's not clear whether the stock's latest tumble is due to more insiders dumping smaller volumes of equity or (worse for Rocket Fuel) external investor fears that the insider trades signal a lack of faith from senior management.

(Emphasis added).

58. On May 8, 2014, Rocket Fuel issued a press release entitled, "Rocket Fuel Reports 95% Revenue Growth in the First Quarter 2014." Therein, the Company, in relevant part, stated:

**Active Customers and Gross Profit More Than Doubled From Year Ago Quarter**

Rocket Fuel Inc. (Nasdaq:FUEL), a leading provider of artificial intelligence and big data solutions for digital advertising, today reported financial results for the first quarter ended March 31, 2014.

"Rocket Fuel continued its strong revenue growth in the first quarter of 2014, reporting an increase of 95% from the first quarter of 2013, and posted its ninth consecutive quarter of more than 100% growth in revenue less media costs and gross profit," said George John, Chairman and CEO of Rocket Fuel. "Strong increases in the number of active customers, gross margin and other channels

revenue, specifically revenue from mobile delivery which grew to 26% of our total, were other notable highlights of our progress during the first quarter compared to the first quarter in the prior year. Rocket Fuel continues to outpace the growth of the digital advertising market by leveraging our artificial intelligence-driven solutions across a growing base of diverse advertisers."

**<u>Financial and Business Highlights for the First Quarter of 2014</u>**

**Revenue** of $74.4 million increased 95% compared to $38.2 million for the first quarter of 2013.

**Revenue less media costs** of $44.7 million increased 107% compared to $21.6 million for the first quarter of 2013, and grew to 60% of revenue for the first quarter of 2014.

**Gross Profit** of $36.9 million increased 110% compared to $17.5 million for the first quarter of 2013, which represented a gross margin improvement to 49.5% from 45.9%, a 364 basis point expansion.

**Net Loss** was $(11.2) million, or $(0.33) per diluted share, compared to a net loss of $(8.1) million, or $(0.97) per diluted share for the first quarter of 2013. Adjusted net loss for the quarter was $(6.3) million, or $(0.18) per diluted share, compared to adjusted net loss of $(5.4) million, or $(0.65) per diluted share, for the first quarter of 2013.

**Adjusted EBITDA** was $(3.7) million compared to $(4.6) million in the first quarter of 2013.

**Other channels revenue** of $29.0 million, which includes revenue from delivery of digital advertising to mobile, social, and video channels, increased by 530% compared to $4.6 million for the first quarter of 2013 and more than tripled from 12% to 39% as a percentage of revenue from the first quarter of 2013. Mobile was the largest component of other channels revenue, at 26% of revenue in the first quarter of 2014.

**Active customer** count expanded to 1,251, up from 560 in the first quarter of 2013**.**

**Employee headcount** increased to a total of 710 as of March 31, 2014, an 87% increase from March 31, 2013.

**Cash and cash equivalents** were $218.2 million as of March 31, 2014. In February 2014, Rocket Fuel received net proceeds from its follow-on offering of approximately $115.4 million.

**Total debt** was $26.9 million as of March 31, 2014.

**Business Outlook**

"Ongoing investment in our proprietary technology platform and our global team helped drive continued strong growth in the first quarter," said J. Peter Bardwick, CFO of Rocket Fuel. "Looking ahead, we anticipate 62% to 69% revenue growth in the second quarter of 2014 over the second quarter of 2013. This should be viewed in the context of our exceptionally rapid growth of 137% in Q2 of 2013 compared to Q2 of 2012. We are reiterating our 2014 guidance as we expect revenue growth in the latter half of the year to increase slightly from our expected Q2 growth rate due to a number of factors, including the impact of recent sales hiring and expanded offerings that enhance our current product suite."

Rocket Fuel is providing an outlook for the second quarter of 2014 and reiterating its full year 2014 outlook as follows:

**Second Quarter 2014**

- Revenue in the range of $88.0 million to $92.0 million
- Adjusted EBITDA in the range of a loss of $(6.0) million to a loss of $(4.5) million

**Fiscal Year 2014**

- Revenue in the range of $420.0 million to $435.0 million
- Adjusted EBITDA in the range of $3.0 million to $6.0 million

59.     On May 15, 2014, Rocket Fuel filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal first quarter.  The Company's Form 10-Q was signed by Defendant Bardwick, and reaffirmed the Company's financial results previously announced on May 8, 2014.

60.     On May 15, 2014, Rocket Fuel filed its Quarterly Report with the SEC on Form 10-Q for the 2014 fiscal first quarter.  The Company's Form 10-Q was signed by Defendant Bardwick, and reaffirmed the Company's financial results previously announced on May 8, 2014.

CLASS ACTION COMPLAINT
24

61. On May 26, 2014, the Financial Times published an article entitled, "Mercedes online ads viewed more by fraudster robots than humans." Therein, the article, in relevant part, stated:

Part of a recent Mercedes-Benz online advertising campaign was viewed more often by automated computer programmes than by human beings, according to documents seen by the Financial Times.

*The ads were inadvertently placed on to fraudulent websites by Rocket Fuel*, a Nasdaq-listed ad technology company that went public last September with a market capitalisation of nearly $1bn.

*The incident will intensify concerns about the prevalence of fraud in the fast-growing online advertising market,* which expanded 15 per cent last year to $120bn.

In Mercedes-Benz's case, the suspicious traffic was discovered in an investigation for the German carmaker by Telemetry, a UK company that specialises in detecting ad fraud.

*In a sample of 365,000 ad impressions brokered by Rocket Fuel over three weeks, Telemetry found that 57 per cent were "viewed" by automated computer programs rather than real people.*

Mercedes said that over the whole of its campaign, the proportion of questionable impressions was less than 6 per cent, and that *Rocket Fuel "refunded us for the suspect impressions".* The carmaker added that it and its US advertising agency, Merkley & Partners, which is part of Omnicom Group, have continued to work with Rocket Fuel.

There is no suggestion that Rocket Fuel, which acts as an intermediary between advertisers and online publishers, was aware that it was delivering its client's ads to fraudsters. The company buys ad inventory via ad exchanges, which are in turn plugged in to thousands of publishers.

*However the findings raise questions about Rocket Fuel's assertions on its website that it "makes sure the 'bad actors' always leave empty-handed".*

Rocket Fuel played down Telemetry's report, saying it was not sure that the figures were "100 per cent correct". It said the findings came from a small sample and did not represent the type of traffic that normally passes through its systems.

> To identify and block suspicious activity, Rocket Fuel uses a combination of its own technology and partnerships with third parties such as Double Verify and Integral Ad Science.
>
> Rocket Fuel said that in February, it identified and rejected 500bn bid requests from online publishers because of inventory quality concerns.
>
> Fraudsters are coming up with increasingly sophisticated ways to deceive online advertisers, using software that mimics the behaviour of a real person browsing the web.
>
> Telemetry detected the bots by identifying anomalies in traffic to the ads. Virtually all of the suspect traffic came from five small internet service providers. And the computers "viewing" the ads used Linux, an operating system rarely used on desktops, though they attempted to disguise this by simulating popular web browsers that only work on Windows or Macs.
> Telemetry said it had traced the ownership of the bot network to two people in the UK, who directed the bots to websites they owned, thereby making money from the ad sales. The websites have since disappeared.

(Emphasis added).

62.    On May 26, 2014, the Financial Times published an article entitled, "Mercedes online ads viewed more by fraudster robots than humans."  Therein, the article, in relevant part, stated:

> Part of a recent Mercedes-Benz online advertising campaign was viewed more often by automated computer programmes than by human beings, according to documents seen by the Financial Times.
>
> ***The ads were inadvertently placed on to fraudulent websites by Rocket Fuel***, a Nasdaq-listed ad technology company that went public last September with a market capitalisation of nearly $1bn.
>
> ***The incident will intensify concerns about the prevalence of fraud in the fast-growing online advertising market,*** which expanded 15 per cent last year to $120bn.
>
> In Mercedes-Benz's case, the suspicious traffic was discovered in an investigation for the German carmaker by Telemetry, a UK company that specialises in detecting ad fraud.

***In a sample of 365,000 ad impressions brokered by Rocket Fuel over three weeks, Telemetry found that 57 per cent were "viewed" by automated computer programs rather than real people.***

Mercedes said that over the whole of its campaign, the proportion of questionable impressions was less than 6 per cent, and that ***Rocket Fuel "refunded us for the suspect impressions".*** The carmaker added that it and its US advertising agency, Merkley & Partners, which is part of Omnicom Group, have continued to work with Rocket Fuel.

There is no suggestion that Rocket Fuel, which acts as an intermediary between advertisers and online publishers, was aware that it was delivering its client's ads to fraudsters. The company buys ad inventory via ad exchanges, which are in turn plugged in to thousands of publishers.

***However the findings raise questions about Rocket Fuel's assertions on its website that it "makes sure the 'bad actors' always leave empty-handed".***

Rocket Fuel played down Telemetry's report, saying it was not sure that the figures were "100 per cent correct". It said the findings came from a small sample and did not represent the type of traffic that normally passes through its systems.

To identify and block suspicious activity, Rocket Fuel uses a combination of its own technology and partnerships with third parties such as Double Verify and Integral Ad Science.

Rocket Fuel said that in February, it identified and rejected 500bn bid requests from online publishers because of inventory quality concerns.

Fraudsters are coming up with increasingly sophisticated ways to deceive online advertisers, using software that mimics the behaviour of a real person browsing the web.

Telemetry detected the bots by identifying anomalies in traffic to the ads. Virtually all of the suspect traffic came from five small internet service providers. And the computers "viewing" the ads used Linux, an operating system rarely used on desktops, though they attempted to disguise this by simulating popular web browsers that only work on Windows or Macs.

Telemetry said it had traced the ownership of the bot network to two people in the UK, who directed the bots to websites they owned, thereby making money from the ad sales. The websites have since disappeared.

(Emphasis added).

63.   On May 27, 2014, Rocket Fuel issued a press release entitled, "A Response to the Financial Times."  Therein, the Company, in relevant part, stated:

> Bots are a real problem, but less so than sensational headlines on top of non-news. A recent Financial Times article cites Mercedes-Benz as estimating that fewer than 6% of an online advertising campaign served by Rocket Fuel were labeled as questionable, yet the headline suggests an apocalypse of digital advertising. Between Rocket Fuel's bot-screening technology and our accredited partners' (in this case, Integral Ad Science) real-time screening, Rocket Fuel found quality ad inventory to serve in place of the 6% of Mercedes ads identified as questionable, and delivered those impressions to humans before any bills were even sent.

> Rocket Fuel takes an aggressive posture to screen bots out of the ad space in the over 200 countries worldwide where we serve our customers' ads. We reject approximately 40% of all ad space daily due to its failure to pass our own bot and brand-safety screens. In February of 2014, when the Financial Times suggests that we delivered approximately 200,000 impressions to bots, we rejected 497,827,451,520 impressions while evaluating approximately 1.1 trillion impressions as candidates for our customers' ads. Put another way, if every ad the Financial Times suggests we delivered were the size of a 1"x1" postage stamp, and those ads were laid down side by side, they would cover 49% of one standard doubles' tennis court. By contrast, we rejected 1,231,173 tennis courts' worth of questionable ad space.

> There is an ongoing arms race between Rocket Fuel and scammers who create fake websites and bot traffic in an attempt to fool advertisers into spending money to "advertise" to these bots who can appear human if not studied carefully. We want to help advertisers make sure they're getting real results from Rocket Fuel and their other partners, and to this end we have been providing free tools for years to help them run clean A/B tests to measure the incremental value Rocket Fuel adds to their advertising. In addition, two weeks ago we announced that we will release a free bot-detection tool that will further help advertisers keep bots out of their results.

> As we help advertisers achieve new levels of success in digital marketing, they spend more with Rocket Fuel. This, in turn, has powered our growth as Deloitte's #1 fastest-growing technology company in North America, and is further evidenced by our industry-leading success-story program which features 45 branded customer testimonials.

64.   In response to the controversy, the Telemetry issued its own statement to clarify its research and implications and questioned Rocket Fuel's claims about ad quality and brand protection.  Therein, Telemetry, in relevant part, stated:

- If an ad tech platform such as Rocket Fuel were unable to detect the fraudulent impressions before we identified them then what does that mean for campaigns that sit outside the sample that Telemetry analyzed?

*    *    *

For clarity, there is no suggestion that Rocket Fuel sold fraudulent impressions willingly or knowingly but ***what our investigations continue to highlight is the extent to which ad tech platforms themselves claim to be 'brand safe' and immune to the articulate and unrelenting vehicles and instruments of online advertising fraud***. To what extent are they actually able to detect and therefore protect against this and how they can best help advertisers.

(Emphasis added).

65.     The statements contained in ¶¶45-64 were materially false and/or misleading when made because defendants failed to disclose or indicate the following: (1) that a significant percentage of ads brokered by Rocket Fuel were viewed by automated computer programs rather than humans; (2) that the Company was unable to detect and eliminate a significant amount of ad fraud despite representations to the contrary; (3) that, as a result, the Company customers were concerned about ad fraud and inventory quality; and (4) that, as a result of the foregoing, Defendants' statements, including statements about Rocket Fuel's ability to protect its customers from ad fraud and the Company's 2014 revenue growth,  were materially false and misleading at all relevant times.

**<u>Disclosures at the End of the Class Period</u>**

66.     On August 5, 2014, after the market closed, Rocket Fuel issued a press release entitled, "Rocket Fuel Reports Second Quarter 2014 Financial Results and Intent to Acquire [x+1]."  Therein, the Company, in relevant part, stated:

*Revenue Grew 70% and Gross Profit Grew 80% Year-Over-Year Combination of Rocket Fuel and [x+1] Will Offer a Wide Array of SaaS-Based Advertising and Marketing Solutions Across All Digital Channels Updated Full Year Standalone Guidance Reflects Tempered Revenue Expectations*

Rocket Fuel Inc. (Nasdaq:FUEL), a leading provider of artificial intelligence and big data solutions for digital advertising, today reported record financial results for the second quarter ended June 30, 2014. In a separate press release, Rocket Fuel also announced a definitive agreement under which it will acquire [x+1], Inc., a leading provider of programmatic marketing and data management solutions. That release, along with slides that describe the transaction, may be accessed at http://investor.rocketfuel.com/.

"Rocket Fuel's 70% revenue growth and 80% gross profit growth over the second quarter of last year demonstrate our ability to deliver the solutions that advertisers need to drive ROI and increase brand impact across channels. We continued to grow rapidly in our mobile business, with 31% of total revenue being from the mobile channel in the second quarter, up sequentially from 26% in the prior quarter," said George John, Chairman and CEO of Rocket Fuel. "We are launching new and expanded solutions at a rapid pace, including Mission Control™, our AI-driven digital marketing hub with expanded self-service tools for digital campaign management; Audience Guarantee, giving brand advertisers the targeted audience impact they need to improve their reach across video and display; and Rocket Fuel Dynamic Personalized Ads, enabling advertisers to programmatically create a nearly unlimited number of ad variations."

<u>**Financial and Business Highlights for the Second Quarter of 2014**</u>

**Revenue** of $92.6 million increased 70% compared to $54.4 million for the second quarter of 2013.

**Revenue less media costs** of $54.7 million increased 84% compared to $29.7 million for the second quarter of 2013, and grew to 59% of revenue for the second quarter of 2014.

**Gross Profit** of $45.7 million increased 80% compared to $25.4 million for the second quarter of 2013, which represented a gross margin improvement to 49.4% from 46.7%, a 265 basis point expansion.

**Net Loss** was $(9.8) million, or $(0.28) per diluted share, compared to a net loss of $(3.8) million, or $(0.46) per diluted share for the second quarter of 2013. Adjusted net loss[1] for the quarter was $(3.8) million, or $(0.11) per diluted share, compared to adjusted net loss of $(0.5) million, or $(0.07) per diluted share, for the second quarter of 2013.

**Adjusted EBITDA** was $(0.4) million compared to $0.3 million in the second quarter of 2013.

**Other channels revenue** of $40.8 million, which includes revenue from delivery of digital advertising to mobile, social, and video channels, increased by 317% compared to $9.8 million for the second quarter of 2013 and more than doubled from 18% to 44% as a percentage of revenue from the second quarter of 2013. Mobile was the largest component of other channels revenue, at 31% of revenue in the second quarter of 2014.

**Active customer** count expanded to 1,444, up from 784 in the second quarter of 2013**.**

**Employee headcount** increased to a total of 826 as of June 30, 2014, a 77% increase from June 30, 2013.

**Cash and cash equivalents** were $203.5 million as of June 30, 2014.

**Total debt** was $26.9 million as of June 30, 2014.

\*        \*        \*

## Business Outlook

Rocket Fuel continues to achieve revenue growth that is significantly outpacing the digital advertising industry. Despite the Company's strong revenue growth in the first half of 2014, advertiser commitments in the latter part of the second quarter for future advertising campaigns were lower than previous internal forecasts. Rocket Fuel attributes this result to a number of expanding trends, including tighter control of client spend by the agencies' internal trading desks and a shift toward direct licensing by advertisers, as well as recent customer concerns about inventory quality on exchanges that impact the entire industry. Rocket Fuel expects these trends to continue to influence its growth rate and as a result is lowering its full year guidance (excluding the impact of the [x+1] transaction). The Company expects to achieve the following results:

Third Quarter 2014

- **Revenue** in the range of $96.0 million to $100.0 million

- **Adjusted EBITDA** in the range of a loss of $(8.5) million to a loss of $(7.0) million

Given the anticipated closing date of the transaction, [x+1] is not expected to have an impact on Rocket Fuel's third quarter financial results.

As a result of the intended acquisition of [x+1], Rocket Fuel will be changing its definition of Adjusted EBITDA2 beginning in the third quarter of 2014. These changes are reflected in the third quarter and fiscal 2014 expectations reflected herein.

**<u>Fiscal Year 2014</u>**

- Revenue in the range of $403.0 million to $427.0 million. This includes standalone revenue of $385.0 million to $405.0 million for Rocket Fuel; and $18.0 million to $22.0 million in revenue from [x+1], assuming the acquisition closes by early in the fourth quarter. This compares with Rocket Fuel's previous standalone guidance range of $420.0 million to $435.0 million.

- Adjusted EBITDA loss in the range of $(12.0) million to $(7.0) million. This includes standalone expectations for a loss of $(8.0) million to $(5.0) million for Rocket Fuel; and a loss of $(4.0) million to $(2.0) million from [x+1], assuming the acquisition closes by early in the fourth quarter. This compares with Rocket Fuel's previous standalone guidance for an Adjusted EBITDA profit of $3.0 million to $6.0 million. These changes to the Company's expectations for Adjusted EBITDA reflect its lower revenue expectations as well as incremental operating costs associated with the acquisition.

Rocket Fuel will integrate [x+1] over the course of 2014, and will not provide separate guidance for the two entities beginning in 2015. Assuming that the transaction closes in the fourth quarter, Rocket Fuel will report its fourth quarter results on a consolidated basis.

Key components of Rocket Fuel's operating strategy for the second half of the year include:

- **Enhancing technology, customer service, and marketing in its core business**. Rocket Fuel will continue investing in core Big Data and AI to drive better ROI for advertisers. Rocket Fuel will continue to develop ad supplier relationships to increase the scale, diversity and quality of ad inventory, which has grown to over 50 billion available impressions per day.

- **Closing the [x+1] transaction and executing integration activities**. Rocket Fuel intends to close the transaction and execute integration activities as quickly as possible to capitalize on the growth opportunities and synergies from the combined entity.

- **Continuing to drive Other Channel revenue.** In the second quarter of 2014 mobile revenue continued its strong growth trajectory and the

1   Company believes it can build on this success during the second half of
2   2014.

3   •   **Accelerating its licensing program, Mission Control™**. In the second
4   quarter, Rocket Fuel's Japanese licensee, cci, managed 140 campaigns for
5   separate advertisers through Mission Control and Rocket Fuel recently
6   announced the expansion of Mission Control globally.  Enabling access to
7   its fully autonomous AI-driven platform to advertisers interested in taking
8   their digital advertising programs in-house will expand Rocket Fuel's
9   value proposition for both brands and advertising agencies.

10   •   **Expanding the Rocket Fuel Brand Advertising Suite with Audience
11   Guarantee solution**. During the second quarter, Rocket Fuel launched the
12   Audience Guarantee program, which is the first programmatic buying
13   solution to provide optimal reach for advertisers across video and display
14   channels, powered by AI. This new solution is oriented toward large
15   advertisers and to date the solution has been rolled out with advertisers
16   including Denny's and BP. Rocket Fuel expects additional rollouts during
17   the second half of 2014.

18   •   **Ensuring continued alignment of operating expenses with revenue
19   expectations**. Based upon its growth expectations in the second half of
20   2014, the Company is adjusting its operating expense structure to better
21   align with opportunities for near-term revenue and adjusted EBITDA
22   growth while continuing to support Rocket Fuel's long-term growth
23   expectations.

24   67.   On August 5, 2014, the Company held a conference call with investors and
25   analysts discussing the 2014 second quarter results.   Therein, Defendant John, in relevant part,
26   stated:

[…] ***Across all channels, we've seen increased advertiser and agency interest
and the quality of ad space and audiences they buy, with increased concerns
around bot traffic and viewability***.
We've used our artificial intelligence technology to automatically deliver high-
quality results against the viewability and audience goals that our customers
require that are separating us from the rest of the industry relying on outdated
manual methods.

\*       \*       \*

But on the other hand, we were surprised by the strength of trends impacting our
bookings in June, and we now feel our full-year guidance should take into account
slightly lower sales productivity based on the following three factors: One,

CLASS ACTION COMPLAINT
33

agencies directing ad spend to their internal trading desks or preferred partners more aggressively; ***Two, industry buzz this summer around bot traffic and low-quality ad space on digital exchanges, which has led some agency media buyers to begin questioning exchanged based buying generally;*** Three, advertisers and agencies feeling like there's strategic value in managing their ad campaign themselves with software and exploring software solutions that we cannot previously address.

68.     During the question and answer portion of the call, analyst Stephen D. Ju from Credit Suisse asked, "And second, in regards to the industry concern around bot traffic, because it seems like the lack of ROI from bot-driven traffic should already be well reflected in the price, so can you add some additional color on the advertising concerns here?" In response, Defendant John, in relevant part, stated:

> See now the bots is actually a similar comment, namely, you would think if you're selling shoes or cars or whatever it is at a certain rate, it's sort of irrelevant to some performance. I guess what's the bot constitution of that traffic? And anyway, we filter out traffic, suspicious traffic so aggressively, the bot composition is very low. But I think it's just a – maybe a few things. One is from the customer perspective, it's I think a phenomenon in our industry that hadn't been well understood, I think by a lot of advertisers. I think agencies have understood, but maybe hadn't really filtered all the way down to advertisers yet. So it's going through I think a brief period of time here. We're sort of like the new thing to be confused about and try to understand.

> But you're right, ultimately, that it's just only a piece of the puzzle and if you're still able to generate better ROI, you would think you would only do that if you weren't [inaudible] robots, since they don't buy things

69.     On this news, shares of Rocket Fuel declined $7.70 per share, over 31%, to close on August 6, 2014, at $17.05 per share, on unusually heavy volume.

## **CLASS ACTION ALLEGATIONS**

71.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all those who purchased or otherwise acquired Rocket Fuel securities: (1) pursuant and/or traceable to the Company's

Registration Statement and Prospectus issued in connection with the Company's IPO on or about September 19, 2013, seeking to pursue remedies under the Securities Act; and/or (2) on the open market between September 20, 2013 and August 5, 2014, inclusive, seeking to pursue remedies under the Exchange Act; and were damaged thereby (collectively, the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

72.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Rocket Fuel's securities were actively traded on the Nasdaq Stock Market (the "NASDAQ").  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Millions of Rocket Fuel shares were traded publicly during the Class Period on the NASDAQ.  As of July 31, 2014, Rocket Fuel had 35,854,036 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Rocket Fuel or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

73.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

74.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

CLASS ACTION COMPLAINT

75.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and management of Rocket Fuel; and

(c) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

76.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**UNDISCLOSED ADVERSE FACTS**

77.     The market for Rocket Fuel's securities was open, well-developed and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, Rocket Fuel's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired Rocket Fuel's securities relying upon the integrity of the market price of the Company's securities and market information relating to Rocket Fuel, and have been damaged thereby.

78.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of Rocket Fuel's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  Said statements and omissions were materially false and/or misleading in that they failed to disclose material adverse information and/or misrepresented the truth about Rocket Fuel business, operations, and prospects as alleged herein.

79.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Rocket Fuel's financial well-being and prospects.  These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein.

**LOSS CAUSATION**

80.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

81.     During the Class Period, Plaintiff and the Class purchased Rocket Fuel's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the

1   information alleged herein to have been concealed from the market, and/or the effects thereof,

2   were revealed, causing investors' losses.

3                          **SCIENTER ALLEGATIONS**

4          82.    As alleged herein, Defendants acted with scienter in that Defendants knew that

5   the public documents and statements issued or disseminated in the name of the Company were

6   materially false and/or misleading; knew that such statements or documents would be issued or

7   disseminated to the investing public; and knowingly and substantially participated or acquiesced

8   in the issuance or dissemination of such statements or documents as primary violations of the

9   federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their

10  receipt of information reflecting the true facts regarding Rocket Fuel, his/her control over, and/or

11  receipt and/or modification of Rocket Fuel's allegedly materially misleading misstatements

12  and/or their associations with the Company which made them privy to confidential proprietary

13  information concerning Rocket Fuel, participated in the fraudulent scheme alleged herein.

14              **APPLICABILITY OF PRESUMPTION OF RELIANCE**
                    **(FRAUD-ON-THE-MARKET DOCTRINE)**

15         83.    The market for Rocket Fuel's securities was open, well-developed and efficient at

16  all relevant times.  As a result of the materially false and/or misleading statements and/or failures

17  to disclose, Rocket Fuel's securities traded at artificially inflated prices during the Class Period.

18  On January 16, 2014, the Company's stock closed at a Class Period high of $66.89 per share.

19  Plaintiff and other members of the Class purchased or otherwise acquired the Company's

20  securities relying upon the integrity of the market price of Rocket Fuel's securities and market

21  information relating to Rocket Fuel, and have been damaged thereby.

22         84.    During the Class Period, the artificial inflation of Rocket Fuel's stock was caused

23  by the material misrepresentations and/or omissions particularized in this Complaint causing the

CLASS ACTION COMPLAINT
38

damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Rocket Fuel's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Rocket Fuel and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

85.     At all relevant times, the market for Rocket Fuel's securities was an efficient market for the following reasons, among others:

(a)     Rocket Fuel stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, Rocket Fuel filed periodic public reports with the SEC and/or the NASDAQ;

(c)     Rocket Fuel regularly communicated with public investors *via* established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     Rocket Fuel was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force

CLASS ACTION COMPLAINT
39

and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

86. As a result of the foregoing, the market for Rocket Fuel's securities promptly digested current information regarding Rocket Fuel from all publicly available sources and reflected such information in Rocket Fuel's stock price. Under these circumstances, all purchasers of Rocket Fuel's securities during the Class Period suffered similar injury through their purchase of Rocket Fuel's securities at artificially inflated prices and a presumption of reliance applies.

## **NO SAFE HARBOR**

87. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Rocket Fuel who knew that the statement was false when made.

## FIRST CLAIM
### Violation of Section 11 of The Securities Act
### (Against All Defendants)

88.     Plaintiff repeats and realleges each and every allegation set forth in above, except any allegation of fraud, recklessness or intentional misconduct.

89.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

90.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

91.     Rocket Fuel is the registrant for the IPO.  The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

92.     As issuer of the shares, Rocket Fuel is strictly liable to Plaintiff and the Class for the misstatements and omissions.

93.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

94.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

95.     Plaintiff acquired Rocket Fuel shares pursuant and/or traceable to the Registration Statement for the IPO.

96.     Plaintiff and the Class have sustained damages.  The value of Rocket Fuel common stock has declined substantially subsequent to and due to Defendants' violations.

**SECOND CLAIM**
**Violation of Section 15 of The Securities Act**
**(Against the Individual Defendants)**

97.     Plaintiff repeats and realleges each and every allegation set forth above, except any allegation of fraud, recklessness or intentional misconduct.

98.     This count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act.

99.     The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Rocket Fuel within the meaning of Section 15 of the Securities Act. The Individual Defendants had the power and influence and exercised the same to cause Rocket Fuel to engage in the acts described herein.

100.     The Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiff and the Class.

101.     By virtue of the conduct alleged herein, the Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

**THIRD CLAIM**
**Violation of Section 10(b) of**
**The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against the Company and the Individual Defendants**

102.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

103.     During the Class Period, the Company and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Rocket Fuel's

securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, defendants, and each of them, took the actions set forth herein.

104.   The Company and the Individual Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Rocket Fuel's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

105.   The Company and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Rocket Fuel's financial well-being and prospects, as specified herein.

106.   These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Rocket Fuel's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Rocket Fuel and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a

CLASS ACTION COMPLAINT
43

course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

107. Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

108. The Company and the Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Rocket Fuel's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Company and the Individual Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, the Company and the Individual Defendants, if

they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

109.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Rocket Fuel's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Company and the Individual Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Company and the Individual Defendants, but not disclosed in public statements by the Company and the Individual Defendants during the Class Period, Plaintiff and the other members of the Class acquired Rocket Fuel's securities during the Class Period at artificially high prices and were damaged thereby.

110.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that Rocket Fuel was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Rocket Fuel securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

111.    By virtue of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

CLASS ACTION COMPLAINT

112.     As a direct and proximate result of the Company and the Individual Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## FOURTH CLAIM
### Violation of Section 20(a) of
### The Exchange Act Against the Individual Defendants

113.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

114.     The Individual Defendants acted as controlling persons of Rocket Fuel within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

115.     In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

CLASS ACTION COMPLAINT
46

116.     As set forth above, Rocket Fuel and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)     such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

//

//

//

//

//

1    Dated: September 10, 2014        GLANCY BINKOW & GOLDBERG LLP

2

3                              By: *s/ Robert V. Prongay*

4                              Lionel Z. Glancy
                             Michael Goldberg

5                              Robert V. Prongay
                             1925 Century Park East, Suite 2100

6                              Los Angeles, CA 90067
                             Telephone: (310) 201-9150

7                              Facsimile: (310) 201-9160

8                              *Attorneys for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GLANCY BINKOW & GOLDBERG LLP

**SWORN CERTIFICATION OF PLAINTIFF**
**ROCKET FUEL, INC. SECURITIES LITIGATION**

I, _SANJIV MEHROTRA_____, certify that:
　　[Please Print Your Name]

1. I have reviewed the Complaint and authorized its filing.

2. I did not purchase Rocket Fuel, Inc., the security that is the subject of this action, at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3. I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4. My transactions in Rocket Fuel, Inc. during the Class Period are set forth below:

    I bought _____ shares on _____/_____/_____ at $ _____ per share

    I bought _____ shares on _____/_____/_____ at $ _____ per share

    I bought _____ shares on _____/_____/_____ at $ _____ per share

    I sold_____ shares on _____/_____/_____ at $ _____ per share

    I sold_____ shares on _____/_____/_____ at $ _____ per share
    (List Additional Transactions On Separate Page If Necessary)

5. I have not served as a representative party on behalf of a class under this title during the last three years.

6. I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

Dated: _9/10/14_____            _____
　　　　　　　　　　　　　　　　　　　　　　　[Please Sign Your Name Above]

| Sanjiv Mehrotra's Transactions in FUEL | | | |
|---|---|---|---|
| Date | Transaction | Quantity | Price |
| 9/27/2013 | PURCHASE | 25 | $53.9000 |
| 9/27/2013 | PURCHASE | 25 | $53.6500 |
| 11/1/2013 | PURCHASE | 43 | $47.9000 |
| 11/1/2013 | PURCHASE | 7 | $47.8900 |
| 11/5/2013 | PURCHASE | 50 | $46.4999 |
| 11/5/2013 | PURCHASE | 50 | $47.7399 |
| 11/6/2013 | PURCHASE | 50 | $46.3599 |
| 11/6/2013 | PURCHASE | 50 | $45.0000 |
| 11/6/2013 | PURCHASE | 25 | $44.6499 |
| 11/8/2013 | PURCHASE | 100 | $38.8500 |
| 11/8/2013 | PURCHASE | 100 | $38.0451 |
| 11/8/2013 | PURCHASE | 50 | $41.9500 |
| 11/8/2013 | PURCHASE | 50 | $40.6900 |
| 11/8/2013 | PURCHASE | 50 | $40.8500 |
| 11/8/2013 | PURCHASE | 50 | $40.3500 |
| 11/8/2013 | PURCHASE | 50 | $40.2500 |
| 11/8/2013 | PURCHASE | 100 | $39.8354 |
| 11/8/2013 | PURCHASE | 50 | $40.7600 |
| 4/3/2014 | PURCHASE | 50 | $38.3400 |
| 4/11/2014 | PURCHASE | 25 | $36.8100 |
| 4/25/2014 | PURCHASE | 25 | $30.6100 |
| 4/25/2014 | PURCHASE | 25 | $31.5100 |
| 4/28/2014 | PURCHASE | 25 | $29.4300 |
| 5/7/2014 | PURCHASE | 100 | $26.7399 |
| 5/7/2014 | PURCHASE | 50 | $28.0400 |
| 5/7/2014 | PURCHASE | 50 | $27.8050 |
| 5/7/2014 | PURCHASE | 50 | $27.5350 |
| 5/7/2014 | PURCHASE | 50 | $26.7390 |
| 5/8/2014 | PURCHASE | 100 | $15.7310 |
| 5/9/2014 | PURCHASE | 48 | $20.0099 |
| 5/9/2014 | PURCHASE | 2 | $20.0050 |
| 5/9/2014 | PURCHASE | 50 | $20.3400 |